UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| B.E. and S.E., minor children by their | ) | |
| mother, legal guardian, and next friend, L.E., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:21-cv-00415-JRS-MG |
| | ) | |
| VIGO COUNTY SCHOOL CORPORATION; | ) | |
| PRINCIPAL, TERRE HAUTE NORTH VIGO | ) | |
| HIGH SCHOOL, in his official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Originally, Plaintiffs B.E. and S.E. filed this action to (1) force the Vigo County School Corporation[1] (the "School Corporation") to use B.E.'s and S.E.'s chosen names and male gender pronouns (including yearbook records), (2) require that B.E. and S.E. be allowed to wear male uniforms for their Junior Air Force ROTC program, (3) grant them complete access to boys' restrooms, and (4) grant them complete access to boys' locker rooms. But the School Corporation already used the Plaintiffs' chosen name and pronouns before suit was filed, the ROTC uniforms are dictated by another entity (the Armed Forces), and Plaintiffs' successful petition in state court to change their legal names and gender markers resolved the request pertaining to the yearbook records. As a result, the only issue before this Court is access to restrooms and locker rooms.

---

[1] Since Plaintiffs have redundantly sued the School Corporation and an employee in his official capacity for the same claims, the School Corporation is the proper and only party. *See Ball v. City of Muncie*, 28 F. Supp. 3d 797, 802 (S.D. Ind. 2014); *Shirley v. Marion Cty. Sheriff's Off.*, No. 119CV01032JPHTAB, 2020 WL 2113409, at *2 (S.D. Ind. May 4, 2020); *Tom Beu Xiong v. Fischer*, 787 F.3d 389, 398 (7th Cir. 2015).

Title IX expressly states that institutions "may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex." 34 C.F.R. § 106.33. These lines are drawn to facilitate discrete use of certain facilities where disrobing and bodily functions are performed that are consistent with biological differences. Consistent with these regulations, the School Corporation has asked that B.E. and S.E. continue to utilize the restrooms consistent with their sex until an anatomical change occurs. Until then, the School Corporation has provided B.E. and S.E. with the option of utilizing a unisex restroom in the health office, and also provided them with passes to utilize the restroom during class whenever necessary.

Plaintiffs' legal position rests almost entirely on *Whitaker v. Kenosha Unified School District No. 1 Board of Education*, 858 F.3d 1034 (7th Cir. 2017). But *Whitaker*, according to the Seventh Circuit, applied the wrong standard. *Whitaker* was also decided without the benefit of the U.S. Supreme Court's decision in *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731 (2020). And *Whitaker* assuredly did not address unfettered access to restrooms and locker rooms that Plaintiffs seek here.

Given the legal developments since *Whitaker*, the different facts presented in this case, and the privacy interests at play here (as Title IX recognizes), Plaintiffs cannot meet the high preliminary injunction standard.

Accordingly, Defendants respectfully request that the motion for preliminary injunction be denied and for all other appropriate relief.

## I.    BACKGROUND FACTS

1.    Vigo County School Corporation serves more than 13,000 students in three traditional high schools, five middle schools, 16 elementary schools, an alternative school, and a virtual school. (ECF No. 29-6 at 1 (Declaration of N. Michael Cox ("Cox Decl.") at ¶ 3.)

2.    B.E. and S.E. are freshman students at the Terre Haute North Vigo County High School. Their mother, L.E., has brought this action on their behalf.

3.    L.E. asserts that B.E. and S.E. have been "recognized as boys" in her home since they were 11 years old, which means that they dress in a masculine manner, have a masculine haircut, and act "lazy." (ECF No. 29-1 at 2 (Deposition of L.E. ("L.E. Dep.") at 22:10-24.)

4.    When B.E. and S.E. were in the eighth grade during the 2020-2021 academic school year, they began writing preferred male names on their homework. (ECF No. 29-1 at 3 (L.E. Dep. at 27:15-29:4.) The middle school principal asked L.E. whether it was alright if teachers used those names and male pronouns, and L.E. provided her permission to do so. (*Id.*) Notably, however, S.E. may have utilized a "they" pronoun as recently as August 2021. (ECF No. 29-2 at 4 (S.E. Dep. at 22:15-23:6.)

5.    During their sixth, seventh, and eighth grade years, B.E. and S.E. utilized the girls' restrooms and locker rooms. (ECF No. 29-1 at 10 (L.E. Dep. at 64:24-65:8.)

6.    The restroom and locker rooms at the Terre Haute North Vigo County High School are separated by sex. (ECF No. 29-4 at 2, 4 (30(b)(6) Deposition of Vigo County School Corporation ("VCSC Dep.") at 37:20-24, 43:5-7.) There is also a unisex restroom in the health office. (ECF No. 29-4 at 2 (*id.* at 35:9-15.) The boys' restrooms have individual stalls separating the toilets, but there are no partitions between the urinals. (ECF No. 29-4 at 2 (*id.* at 37:25-38:9.) The locker rooms have open areas in which students may change:

3

 

(*See* ECF No. 29-6 at 1, 3-12 (Cox Decl. at ¶¶ 5-6 and accompanying photos); ECF No. 29-4 at 4

(VCSC Dep. at 43:22-44:5)

    7.     The showers in the locker rooms are in an open space and do not have private stalls:



(*See* ECF No. 29-6 at 1, 3-12 (Cox Decl. at ¶¶ 5-6 and accompanying photos); ECF No. 29-4 at 4

(VCSC Dep. at 43:19-21.)

8.      On August 18, 2021, L.E. emailed B.E.'s and S.E.'s special education teacher to

ask whether an accommodation could be made to allow her children to utilize the boys' locker

rooms before or after other students or to utilize a separate boys' locker room:

> [I]s there any way that they can use the boy locker room in a different lock [sic]
> room because you do have other locker rooms or let them go into boys lock [sic]
> room AFTER or Before the the [sic] class starts or ends??!! Please I do understand
> that they can't go inside with the boys and honestly they don't either it's just the
> fact that it is what they prefer what they are BOYS!! I honestly hate this but I have
> to Support their decision or maybe I don't know I'm having a hard time excepting
> [sic] I'm sorry!!

(ECF No. 29-5 at 16 (Dep. Ex. 7 at VCSC_000018.)

9.      In early September 2021, L.E., B.E., and S.E. attended a meeting with the high

school vice principal after someone reported that B.E. and S.E. had used the boys' restroom. (ECF

No. 29-1 at 7 (L.E. Dep. at 54:9-55:8.) At that meeting, B.E. and S.E. were advised that they were

to use the girls' restrooms or the unisex restroom in the health office. (ECF No. 29-1 at 7 (*id.* at

54:20-25.)

10.     In October 2021, L.E. met with the high school principal and vice principal. (ECF

No. 29-1 at 8 (L.E. Dep. at 57:20-25.) At the meeting, the administrators reiterated that B.E. and

S.E. would not be allowed access to the male restrooms or locker rooms. (ECF No. 29-1 at 8 (L.E.

Dep. at 58:11-59:3.) L.E. was advised that B.E. and S.E. would be provided with passes to go to

the restroom if they needed to use the restroom during class. (ECF No. 29-1 at 11-12 (L.E. Dep.

at 70:13-72:4.) The school has complied with that accommodation. (ECF No. 29-1 at 11-12 (*see

id.* at 70:13-72:4, 74:4-8; *see also* ECF No. 29-2 at 2 (S.E. Dep. 15:4-18.)

11.     On or about October 18, 2021, L.E. provided physician's notes to the high school principal requesting that B.E. and S.E. each be allowed to "use bathrooms and locker rooms that are congruent with his male gender." (See ECF No. 29-5 at 5-8 (Dep. Exs. 4, 5.) L.E. concedes that these requests are based on her children's gender and not based on her children's sex. (ECF No. 29-1 at 12 (L.E. Depo. at 72:5-12, 74:9-16.)

12.     B.E. and S.E. have utilized the health office restroom every day that they have been at school, multiple times over the course of a day. (ECF No. 29-3 at 5 (B.E. Dep. at 35:4-11); ECF No. 29-2 at 4 (S.E. Dep. at 21:4-12) There have been a few occasions where the health office has been locked, after which they waited for the door to be unlocked and were able to use the restroom. (ECF No. 29-3 at 5 (B.E. Dep. at 35:12-36:12); ECF No. 29-2 at 4 (S.E. Dep. at 21:13-22:9.)

13.     B.E. and S.E. have had gastrointestinal issues since they were infants, which require that they take laxatives. (ECF No. 29-3 at 3 (B.E. Dep. at 27:2-13); ECF No. 29-2 at 3 (S.E. Dep. at 18:10-13.) They claim in a declaration prepared by their attorneys that they have had restroom accidents at school in the past as a result of this health issue, but could not identify the specifics of any such alleged accidents during high school. (ECF No. 29-3 at 4 (B.E. Dep. at 30:12-31:24); ECF No. 29-2 at 3 (S.E. Dep. at 19:14-21.) B.E. testified that L.E. picked B.E. up from school because B.E.'s stomach hurt on three occasions, but only once because B.E.'s stomach hurt from "holding it." (ECF No. 29-3 at 5 (B.E. Dep. at 33:12-35:3.) Moreover, while their mother claimed that there were instances where she was required to bring B.E. and S.E. a change of clothes, she conceded that she could recall only one such instance for S.E. in high school and that the other instances occurred during middle school, which was prior to any request by B.E. or S.E. to use the male restrooms. (ECF No. 29-1 at 14 (L.E. Dep. at 80:2-9, 82:9-23.)

14.     On December 2, 2021, B.E. and S.E. secured orders from an Indiana state court legally changing their names and gender markers to male. (ECF No. 29-5 at 1-4 (Dep. Exs. 2, 3.) Prior to obtaining those state court orders, L.E. and her children's Aunt each had contacted teachers and administrators to make the children's preferred names and pronouns known and to request their use at the school. (See ECF No. 29-5 at 9-13, 19-20 (Dep. Ex. 7 at VCSC_000011-15, VCSC_000022-23.) Their teachers were supportive of B.E. and S.E., accommodated the name and pronoun requests prior to the state court orders, and generally have been supportive of B.E. and S.E. (ECF No. 29-3 at 5-6 (B.E. Dep. at 36:13-18, 37:2-6); ECF No. 29-2 at 4 (S.E. Dep. at 23:9-17); *see, e.g.*, ECF No. 29-5 at 14-16, 17-20 (Dep. Ex. 7 at VCSC_000016, VCSC_000017-18, VCSC_000020-23.)[2]

15.     The School Corporation put a notice in its electronic records regarding the names that B.E. and S.E. wanted to be known by. (*See* ECF No. 29-5 at 13 (Dep. Ex. 7 at VCSC_000015.) However, the School Corporation was unable to change the legal names and gender markers in its administrative electronic records prior to B.E. and SE. legally changing them. (ECF No. 29-7 at 1 (Declaration of Stacy Mason at ¶ 3.) Once the school received the Indiana state court orders legally changing them, the School Corporation changed the administrative electronic records. (*Id.*, ¶ 4.)

16.     Although B.E. and S.E. have legally changed their names and gender markers, they have not legally changed their biological sex, nor have they gone through a surgical change to alter their physical anatomy. (ECF No. 29-1 at 5 (L.E. Dep. at 41:9-22.) As a result, their external

_____

[2] Although B.E. and S.E. each identified isolated instances where substitute teachers used a different name or gender pronoun than desired, B.E. and S.E. brought those instances to the attention of those substitute teachers, who then corrected themselves or did not say anything else on the topic. (*See* ECF No. 29-3 at 6-7 (B.E. Dep. at 37:7-41:4); ECF No. 29-2 at 4-5 (S.E. Dep. at 23:18-25:2.)

physical anatomy remains that of biological females. (ECF No. 29-1 at 5, 16 (*id.* at 41:9-22, 42:12-13, 90:23-91:1, 91:17-25.)

17.     B.E. and S.E. participate in the Air Force Junior ROTC program at the high school, which is provided pursuant to a Memorandum of Understanding between the School Corporation and the United States Air Force. (ECF No. 29-4 at 4 (VCSC Dep. at 45:11-46:8.) B.E. and S.E. have asked that they be allowed to wear the male ROTC uniform. (ECF No. 29-4 at 4 (VCSC Dep. at 46:9-13.) The School Corporation does not have authority over which uniforms are worn, as that decision is controlled by the United States Air Force. (ECF No. 29-4 at 4-5 (VCSC Dep. at 46:14-47:7.)

## II.   STANDARD OF REVIEW

"To obtain a preliminary injunction, a plaintiff must first show that: (1) without such relief, it will suffer irreparable harm before final resolution of its claims; (2) traditional legal remedies would be inadequate; and (3) it has some likelihood of success on the merits." *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018). "If a plaintiff makes such a showing, the court next must weigh the harm the plaintiff will suffer without an injunction against the harm the defendant will suffer with one." *Id.* "This assessment is made on a sliding scale: 'The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor.'" *Id.* (citation omitted). "Finally, the court must ask whether the preliminary injunction is in the public interest, which entails taking into account any effects on non-parties." *Id.* "Ultimately, the moving party bears the burden of showing that a preliminary injunction is warranted." *Id.* "Mandatory preliminary injunctions—those 'requiring an affirmative act by the defendant'—are 'ordinarily cautiously viewed and sparingly issued.'" *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020).

### III.   LEGAL ARGUMENT

As set forth above, there is no pending dispute in this action pertaining to the use of legal names or male pronouns, as the School Corporation voluntarily complied with Plaintiffs' requests in that regard before suit was filed. Furthermore, the School Corporation does not control which uniforms B.E. and S.E. wear for the Air Force ROTC program, and so they are not the correct defendant for any such request. Instead, the dispute between the parties pertains to the use of the boys' restrooms and locker rooms, including whether Title IX and the Equal Protection Clause to the United States Constitution mandate that B.E. and S.E. be allowed to utilize the boys' restrooms and locker rooms and, if so, when such access is appropriate.

Importantly, the School Corporation is not denying B.E. and S.E. access without regard to their transition progress. Rather, the School Corporation requires certain steps in transition be satisfied before extending restroom and locker room accommodations—steps that B.E. and S.E. have not yet taken here.

This issue is one that the School Corporation takes seriously and which it seeks the guidance of this Court, as it is one that has been left an open question by the Supreme Court's decision in *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731 (2020). Indeed, in *Bostock*, the United States Supreme Court noted that issues of "sex-segregated bathrooms, locker rooms, and dress codes" were not before the Court, as it had "not had the benefit of adversarial testing about the meaning" of laws pertaining to those issues. 140 S. Ct. at 1753. And while the Seventh Circuit's decision in *Whitaker* addressed restroom usage, that decision applied an incorrect standard of review as to the likelihood of success prong, failed to properly consider the plain terms of Title IX's regulations, did not address issues pertaining to locker rooms and the inherent lack of privacy

inherent in such spaces, and premised its decision on an analytical framework that the Supreme Court declined to adopt in *Bostock*.

In the discussion that follows, the School Corporation provides an analysis of the claims asserted under Title IX and the Equal Protection Clause, beginning with the plain text of Title IX and its regulations which serve as the basis of the School Corporation's position to provide separate restrooms and locker rooms on the basis of sex. The School Corporation then considers the balance of harms to the parties in relation to Plaintiffs' requested relief and public policy, each of which weighs against granting Plaintiffs' requested preliminary injunction.

### A. Likelihood of Success on the Merits

### i. Title IX's expressly allows institutions to provide separate toilet and locker room facilities on the basis of sex, and therefore the School Corporation's position complies with Title IX.

Fifty years ago, the provisions enacted as Title IX were introduced in the Senate by Senator Birch Bayh during debate on the Education Amendments of 1972. *See N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 524 (1982). "Title IX was Congress's response to significant concerns about discrimination against women in education." *Neal v. Bd. of Trustees of California State Universities*, 198 F.3d 763, 766 (9th Cir. 1999). "Title IX was passed with two objectives in mind: 'to avoid the use of federal resources to support discriminatory practices,' and 'to provide individual citizens effective protection against those practices.'" *Cohen v. Brown Univ.*, 101 F.3d 155, 165 (1st Cir. 1996) (quoting *Cannon v. University of Chicago*, 441 U.S. 677, 704 (1979)).

Title IX mandates that no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Yet, "nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act,

10

from maintaining separate living facilities for the different sexes." *Id.* § 1686. Indeed, Title IX's implementing regulations expressly state that institutions "may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex." 34 C.F.R. § 106.33.

The narrow-tailoring of this regulation to separate toilet, locker room, and shower facilities—while not extending this permission to other areas such as classrooms, laboratories, hallways or lunchrooms—illuminates the pragmatic Title IX approach. Simply put, Title IX expressly permits the segregation of facilities on the basis of enduring biological differences only in those areas where the biological differences matter, are most likely to be exposed, and where privacy interests are heightened.

When Title IX and its implementing regulations were enacted, privacy concerns were recognized as elevated in those areas where clothes are removed and personal bodily functions are performed.  *See Young v. Superior Ct.*, 57 Cal. App. 3d 883, 887, 129 Cal. Rptr. 422, 425 (Ct. App. 1976) ("An occupant of a closed bathroom, the same as an occupant of a closed bedroom, is entitled to an expectation of privacy far greater than those persons in the common areas of a house, such as the living room and kitchen."). That recognition has not changed.

Those same privacy distinctions remain true today. In *Hernandez v. Hillsides, Inc.*, 211 P.3d 1063, 1075 (2009), the California Supreme Court reviewed an appeal of a tort claim alleging invasion of privacy at a place of employment where video surveillance was used. *Id.* at 1066. Addressing a central issue in the case—expectation of privacy, the court surveyed rulings from state and federal courts. *Id.* at 1075. "At one end of the spectrum are settings in which work or business is conducted in an open and accessible space, within the sight and hearing not only of coworkers and supervisors, but also of customers, visitors, and the general public." *Id.* (collecting

cases involving an outdoor patio of public restaurant; common, open, and exposed area of a workplace; and monitoring of customers as they shop in stores.). In those public settings, privacy interests are diminished. *See id.* at 1075.

"At the other end of the spectrum are areas in the workplace subject to restricted access and limited view, and reserved exclusively for performing bodily functions or other inherently personal acts." *Id.* Analyzing this end of the privacy spectrum with more heightened interests, the court cited *Trujillo v. City of Ontario*, 428 F. Supp. 2d 1094, 1099–1100, 1103, 1119–1122 (C.D. Cal. 2006), as "recognizing that employees have common law and constitutional privacy interests while using locker room in basement of police station, and can reasonably expect that employer will not intrude by secretly videotaping them as they undress"; *Doe by Doe v. B.P.S. Guard Services, Inc.*, 945 F.2d 1422, 1424, 1427 (8th Cir. 1991), for the "similar conclusion as to models who were secretly viewed and videotaped while changing clothes behind curtained area at fashion show"; and *Liberti v. Walt Disney World Co.*, 912 F. Supp. 1494, 1499, 1506 (M.D. Fla.1995), for a "similar conclusion as to dancers who were secretly viewed and videotaped while changing clothes and using restroom in dressing room at work." *Id.* As was the case when Title IX was enacted, spaces where individuals change clothes or relieve themselves are treated differently than other spaces.

Title IX couples the unique privacy interests in these areas with the recognized physical differences between the sexes. "Physical differences between men and women are enduring." *United States v. Virginia*, 518 U.S. 515, 533 (1996) (Ginsburg, J.) (cleaned up). And these physical differences are most likely to be exposed in those areas reserved exclusively for performing bodily functions or other inherently personal acts. The unique permission found in Title IX—but not in Title VII—regarding different facilities for the sexes "undoubtedly was permitted because the

areas identified by the regulations are places where male and female students may have to expose their nude or partially nude body, genitalia, and other private parts, and separation from members of the opposite sex, those whose bodies possessed a different anatomical structure, was needed to ensure personal privacy." *Texas v. United States*, 201 F. Supp. 3d 810, 833 (N.D. Tex. 2016), *order clarified*, No. 7:16-CV-00054-O, 2016 WL 7852331 (N.D. Tex. Oct. 18, 2016) (cleaned up). Indeed, Title IX even extends this anatomical-centric permission to "separate educational sessions for boys and girls when dealing with instruction concerning human sexuality." *Id.* (citing 34 C.F.R. § 106.34).

Consistent with these regulations, the recognized privacy interests in these areas of facilities, and this historical understanding of the physical differences between the sexes, the School Corporation provides separate restroom and locker room facilities on the basis of sex in an anatomical sense. In this way, the School Corporation's position completely aligns with Title IX.

ii. **This Court is not bound by *Whitaker* since it applied the wrong standard, does not consider *Bostock*, and addresses different facts.**

In their supporting brief, Plaintiffs omit any reference to 34 C.F.R. § 106.33. Instead, Plaintiffs contend that this Court is bound by the Seventh Circuit's decision in *Whitaker v. Kenosha Unified School District No. 1 Board of Education*, 858 F.3d 1034 (7th Cir. 2017). There are, however, four reasons that *Whitaker* is not binding here.

First, the Seventh Circuit has since criticized *Whitaker* for using the wrong standard of review. *See Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762-63 (7th Cir. 2020). Thus, any discussion of the merits by the *Whitaker* panel—which was premised on the "low threshold" of the "better than negligible" standard, *see* 858 F.3d at 1046, should have no precedential value here.

Second, the *Whitaker* court's analysis is additionally cast into doubt by the *Bostock* decision. In *Whitaker*, the Seventh Circuit looked to Title VII when construing Title IX, and found

that a student who identified as a transgender male could bring a sex-discrimination claim based on a sex-stereotyping theory under *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). Yet, in *Bostock*, the Supreme Court expressly declined to extend its ruling as it pertained to sex discrimination in the workplace (which is prohibited by Title VII) to issues pertaining to sex assigned restrooms and locker rooms (which are expressly permitted by Title IX). Indeed, in *Bostock*, the United States Supreme Court noted that issues of "sex-segregated bathrooms, locker rooms, and dress codes" were not before the Court, as it had "not had the benefit of adversarial testing about the meaning" of laws pertaining to those issues. 140 S. Ct. at 1753.

Third, the *Whitaker* analysis assumed that the sex stereotypying framework borrowed from Title VII applies in the Title IX restroom context, which *Bostock* does not embrace. *See also Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1224-25 (10th Cir. 2007) (*Price Waterhouse* does not require "employers to allow biological males to use women's restrooms. Use of a restroom designated for the opposite sex does not constitute a mere failure to conform to sex stereotypes."), *overruled on other grounds by Bostock*, 140 S. Ct. 1731. The U.S. Supreme Court specifically reserved this very issue for another day, and *Whitaker* offers no help in understanding why the distinction is "on the basis of sex." *Compare* 858 F.3d at 1047 with 34 C.F.R. § 106.33. Logically, if requiring students to use bathrooms based on sex is unlawful sex stereotyping, then Title IX is itself unlawful.

Finally, the School Corporation's position cannot in any way be characterized as sex stereotyping. The School Corporation's position does not take into account how boys or girls ought to behave or dress, nor does it concern itself with stereotypes about either of the sexes.[3] Instead,

---

[3] In contrast, L.E.'s testified that B.E. and S.E. have been recognized boys in her home, which means that they wear masculine clothing, have masculine haircuts, and are "lazy." ([ECF No. 29-1 at 2](#) (L.E. Dep. at 22:10-24.) Moreover, B.E. and S.E. both claim to wear masculine clothing and hairstyles—ascribing their own subjective assessments of what masculine clothing and hairstyles

consistent with Title IX and its regulations, the School Corporation's position is based on the fact that Title IX allows schools to separate toilet and locker room facilities on the basis of anatomical differences in those facility spaces where it matters—those areas where disrobing and performance of bodily functions increase the exposure of these anatomical differences. As a result, Plaintiffs are unlikely to succeed on the merits of their Title IX claim.

### iii. The provision of male and female restrooms and locker rooms on the basis of sex does not violate the Equal Protection Clause.

The Equal Protection Clause of the Fourteenth Amendment, § 1, commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws." "Of course, most laws differentiate in some fashion between classes of persons. The Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). "Equal protection of the laws means that all persons similarly situated should be treated alike." *United States v. Nagel*, 559 F.3d 756, 760 (7th Cir. 2009).

The Equal Protection Clause "does not make sex a proscribed classification," and therefore a policy that classifies on the basis of sex is constitutional if it survives the two requirements of intermediate scrutiny. *United States v. Virginia*, 518 U.S. 515, 533 (1996). First, the government must prove that the "classification serves important governmental objectives." *Id.* (internal quotation marks omitted). Second, the government must prove that "the discriminatory means employed are substantially related to the achievement of those objectives." *Id.* (internal quotation marks omitted). "This intermediate level of judicial scrutiny recognizes that sex 'has never been

---

are and claiming they now conform to such standards, each stating that "[o]thers now correctly view me as a boy based on my appearance." (ECF Nos. 22-4 and 22-5 at ¶¶ 6-7.)

rejected as an impermissible classification in all instances.'" *Tagami v. City of Chicago*, 875 F.3d 375, 380 (7th Cir. 2017) (citation omitted).

Here, the School Corporation's sex-separated bathrooms policy or practice, just like Title IX, satisfies both prongs. First, the policy or practice serves important objectives of protecting the interests of students in using the restroom or locker room away from the opposite sex and in shielding their bodies from exposure to the opposite sex. "Across societies and throughout history, it has been commonplace and universally accepted to separate public restrooms, locker rooms, and shower facilities on the basis of biological sex in order to address privacy and safety concerns arising from the biological differences between males and females." *G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*, 822 F.3d 709, 734 (4th Cir. 2016) (Niemeyer, J., concurring in part and dissenting in part), *vacated*, —— U.S. ——, 137 S. Ct. 1239, 197 L.Ed.2d 460 (2017). "The desire to shield one's unclothed figure from view of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity." *York v. Story*, 324 F.2d 450, 455 (9th Cir. 1963). *See also Brannum v. Overton Cnty. Sch. Bd.*, 516 F.3d 489, 494 (6th Cir. 2008) (recognizing constitutional right to privacy, which includes "the right to shield one's body from exposure to viewing by the opposite sex" in context of video surveillance in school locker rooms); *Forts v. Ward*, 621 F.2d 1210, 1217 (2d Cir. 1980) (noting privacy interest "entitled to protection concerns the involuntary viewing of private parts of the body by members of the opposite sex"); *Strickler v. Waters*, 989 F.2d 1375, 1387 (4th Cir. 1993) ("[W]hen not reasonably necessary, exposure of a prisoner's genitals to members of the opposite sex violates his constitutional rights."). If this approach does not satisfy constitutional scrutiny, then neither does Title IX's facilities provisions.

The policy is also substantially related to the achievement of these objectives, as it requires that students use the bathroom in a separate space from the opposite sex and thus protects against exposure of a students' body to the opposite sex. "[T]he Supreme Court has long required that courts defer to the judgment of public-school officials in this context." *Adams v. Sch. Bd. of St. Johns Cnty., Fla.*, 3 F.4th 1299, 1328 (11th Cir.) (Riley, J., dissenting), *rehearing en banc granted*, 9 F.4h 1369 (11th Cir. 2021). Moreover, "[c]ourts have long understood that the 'special sense of privacy' that individuals hold in avoiding bodily exposure is heightened 'in the presence of people of the other sex.'" *Id.* at 1331 (collecting authority). As a result, the School Corporation's position does not violate the Equal Protection Clause. This factor weighs against Plaintiffs' requested injunction.

This conclusion is supported by the Seventh Circuit's Equal Protection analysis in *Tagami v. City of Chicago*, 875 F.3d 375 (7th Cir. 2017). There, the plaintiff claimed that the City of Chicago's ordinance prohibiting women from exposing their breasts in public amounted to sex discrimination in violation of the Equal Protection Clause. The Seventh Circuit rejected that argument, noting that the ordinance furthered a substantial governmental interest "in preserving health, safety, and traditional moral norms," since the "ordinance protects unwilling members of the public—especially children—from unwanted exposure to nudity." *Id.* at 379. In doing so, the Seventh Circuit recognized the "basic physiological differences between the sexes." *Id.* at 380. Thus, the public-nudity ordinance easily survived, since its essential purposes of promoting traditional moral norms and public order were self-evident and important. *Id.* at 379-80.

These same interests of shielding children from unwanted exposure to the anatomy of the opposite sex are implicated here, and underscore the School Corporation's decision not to allow access to restrooms and locker rooms to students of the opposite sex without surgical or anatomical

change. (ECF No. 29-4 at 3 (VCSC Dep. at 41:19-42:16.) The School Corporation's position is founded on the privacy interests of its students and an effort to provide a safe space to all of its students, including B.E. and S.E. (*Id.*)

Notably, in *Whitaker*, the Seventh Circuit panel reached a different conclusion on the Equal Protection claim raised there, finding that the plaintiff was likely to succeed on the merits because the defendant school district "treat[ed] transgender students . . . who fail to conform to the sex-based stereotypes associated with their assigned sex at birth, differently." 858 F.3d at 1051. This analysis wrongly applies Title VII jurisprudence in an area in which the U.S. Supreme Court has not yet gone. *Bostock*, 140 S. Ct. at 1753. Even so, the *Whitaker* court recognized that the defendant school district "ha[d] a legitimate interest in ensuring bathroom privacy rights are protected," but that students' privacy rights were not in jeopardy since "the practical reality" was that the plaintiff used the bathroom "by entering a stall and closing the door." *Id.* at 1052. As such, the court found that "[a] transgender student's presence in the restroom provides no more of a risk to other students' privacy rights than the presence of an overly curious student of the same biological sex who decides to sneak glances at his or her classmates performing their bodily functions." *Id.*

Here, unlike *Whitaker*, B.E. and S.E. have not limited their request for injunctive relief to being allowed to utilize the private stalls in the boys' restrooms, but have instead asked that they be allowed to "use the male restrooms and locker rooms." (ECF No. 22 at 32.) This broad request—which includes no apparent limitations as it pertains to undressing in the locker room, showering in front of other students, or being in the presence of other students who are undressing or showering—far exceeds the "practical reality" of the injunction entered in *Whitaker* and implicates the privacy rights that the *Whitaker* court acknowledged are present in the restroom setting. *See also Adams*, 3 F.4th at 1313 (upholding transgender plaintiff's access to male restroom but noting

that issue relating to use of locker room was not before it and "would entail a separate analysis of the means-ends fit in light of the particular interests at stake" because restrooms at issue "all contain[ed] separate stalls with doors that close and lock"), *rehearing en banc granted.*

It is unclear whether B.E. and S.E. really intend to utilize access to the boys' restrooms and the locker rooms in a way that would reveal their anatomy to other students, as doing so would seem to contradict their efforts to maintain privacy. Both B.E. and S.E. acknowledged that in those instances at the beginning of the school year when they used the boys' restroom, they used the individual stalls. (ECF No. 29-3 at 2 (B.E. Dep. at 21:24-22:10); ECF No. 29-2 at 2 (S.E. Dep. at 13:17-20.) Likewise, when they changed into ROTC uniforms in the boys' restroom, they each did so in an individual stall for privacy. (ECF No. 29-3 at 7-8 (B.E. Dep. at 44:16-45:6); ECF No. 29-2 at 5 (S.E. Dep. at 28:19-21.) S.E. testified that S.E.'s group of friends believe that S.E. is a "biological boy" with the "anatomy of a male." (ECF No. 29-2 at 6 (S.E. Depo. at 30:23-31:2.) This underscores the uncertainties that the School Corporation has encountered in its efforts to navigate these issues with Plaintiffs prior to the filing of this lawsuit, and the need for narrowly tailored relief should any injunction be deemed appropriate.

**B. Balance of Harms**

The balance of harms analysis also weighs against B.E.'s and S.E.'s request to have unfettered access to the boys' restrooms and locker rooms. Although B.E. and S.E. have experienced gastrointestinal issues since birth, those issues are unrelated to any gender transition, and the School Corporation has made accommodations to allow B.E. and S.E. to leave class whenever necessary to use the restroom. (ECF No. 29-1 at 11-12 (L.E. Dep. at 70:13-72:4, 74:4-8; ECF No. 29-2 at 2 (S.E. Dep. at 15:4-18.) Unlike the plaintiff in *Whitaker*, there is no evidence that B.E. or S.E. have restricted their water intake, or that they have contemplated self harm as

result of the restroom options offered to them.[4] *Cf.* 858 F.3d at 1040-42. Instead, B.E. and S.E. voluntarily admitted that they have used the unisex health office bathrooms multiple times per day. (ECF No. 29-3 at 5 (B.E. Dep. at 35:4-11); ECF No. 29-2 at 4 (S.E. Dep. at 21:4-12.) And while there have been a few isolated instances in the past where the health office restroom was locked, those issues have ultimately been resolved. (ECF No. 29-3 at 5 (B.E. Dep. at 35:12-36:12); ECF No. 29-2 at 4 (S.E. Dep. at 21:13-22:9.) There is also no evidence that B.E. or S.E. have been ostracized or singled out for their use of the health office restroom.[5]

While B.E. and S.E. claimed in declarations that they have had multiple "accidents" from not being able to use the male restrooms, they could not provide any specific detail to back up their claims. (ECF No. 29-3 at 4 (B.E. Dep. at 30:12-31:24); ECF No. 29-2 at 3 (S.E. Dep. at 19:14-21.) B.E. testified that L.E. picked B.E. up from school because B.E.'s stomach hurt on three occasions, but only once because B.E.'s stomach hurt from "holding it." (ECF No. 29-3 at 5 (B.E. Dep. at 33:12-35:3.) Moreover, while their mother claimed that there were instances where she was required to bring B.E. and S.E. a change of clothes, she conceded that she could recall only one such instance for S.E. in high school and that the other instances occurred during middle school,

---

[4] The expert reports provided by Plaintiffs do not support a contrary result, as one opines that she has "not yet reviewed the medical records of the plaintiffs" (ECF No. 22-1 at ¶ 6), and the other relies heavily on inadmissible hearsay about what other unnamed individuals have allegedly experienced or reported (*see* ECF No. 22-2 at ¶¶ 30-33). As a result, the School Corporation objects to these experts' testimony to the extent that they are based on inadmissible hearsay, and reserves its rights to challenge such testimony at the appropriate time after the opportunity to depose each witness.

[5] Indeed, when they were each asked if they had been bullied at school, B.E. and S.E. claimed that a classmate from middle school recognized B.E. and S.E. by their former "dead names" and said that they looked different, that they had changed, and that they were actually girls. (ECF No. 29-3 at 7 (B.E. Dep. at 41:5-43:17); ECF No. 29-2 at 5 (S.E. Dep. at 26:7-27:22.) B.E. reported these comments to the math teacher, who moved that student to a different seat and "[i]t's been better." (ECF No. 29-3 at 7 (B.E. Dep. at 43:7-22.)

which was prior to any request by B.E. or S.E. to use the male restrooms. (ECF No. 29-1 at 14 (L.E. Dep. at 80:2-9, 82:9-23.)

On the other hand, granting B.E. and S.E. unrestricted access to the boys' restrooms and locker rooms would violate the privacy interests of their classmates as discussed above and would contradict the aims that B.E. and S.E. have outlined in maintaining their own privacy. Moreover, such a mandate would create many uncertainties for the School Corporation, as the School Corporation would be expected and required to immediately police students with different anatomy disrobing and showering in the same facility. This burden would be especially acute during the COVID-19 pandemic, as the School Corporation, like many other institutions, struggles with staffing. And if the School Corporation is unable to rely upon Title IX's regulations, which expressly allow for separate facilities by sex, School Corporation administrators and faculty will be forced to navigate this new frontier without the benefit of established rules.

A primary objective in this case should be to protect the privacy interests of all students, including B.E. and S.E. As a result, the balance of harms analysis favors maintaining the status quo. Furthermore, even if the Court finds that students' privacy interests can be maintained by allowing S.E. and B.E. to use the individual stalls in the boys' restrooms (and it should not), that same analysis does not apply to the boys' locker room, which does not include individual stalls in the locker area or the communal shower.

**C. Public Policy**

Public policy also weighs against the requested injunction in this case, as demonstrated by the plain language of Title IX and its regulations. As set forth above, when Title IX was enacted, it expressly permitted the separation of facilities on the basis of enduring biological differences only in those areas where the biological differences matter, are most likely to be exposed, and

where privacy interests are heightened. In this way, the applicable regulations allow institutions to "provide separate toilet, locker room, and shower facilities on the basis of sex." 34 C.F.R. § 106.33. This regulation furthers interests of personal privacy, consistent with the aims of Title IX.

To the extent that Title IX should not allow the separation of such facilities, that decision should be made through elected representatives in Congress, using clearly understood text, or through the notice and comment process for the revision of federal regulations required by the Administrative Procedure Act, 5 U.S.C. § 553. *See Eli Lilly & Co. v. Cochran*, 526 F. Supp. 3d 393, 408-09 (S.D. Ind. 2021) (noting that the APA's procedural protections "provide an essential pathway by which the interested public may inform the agency of the ways and extent any potential policy changes will impact those being regulated").[6]

## IV.   CONCLUSION

For the foregoing reasons, the School Corporation respectfully requests that the motion for preliminary injunction be denied.

---

[6] Deciding these issues through a notice/comment or legislative process, and certainly not through expedited review and relief in court, allows for the consideration and development of a framework for students who claim to be nonbinary or "gender fluid." As recognized by Justice Alito in dissent in *Bostock*, "a person who has not undertaken any physical transitioning may claim the right to use the bathroom or locker room assigned to the sex with which the individual identifies at that particular time." 140 S. Ct. at 1779. The Supreme Court has provided "no clue" on why applying the Title VII framework to such a claim would not fail, *see id.*, which would create an untenable situation for schools as they seek to navigate these issues in a way that upholds the safety and privacy of students. The Court's ruling in this case and its effect on accommodations impacts nonbinary or other students, which is why deference to the administrative rule or legislative process is prudent.

Respectfully submitted,

/s/ *Philip R. Zimmerly*
Jonathan L. Mayes (#25690-49)
Philip R. Zimmerly (#30217-06)
Mark A. Wohlford (#31568-03)
BOSE McKINNEY & EVANS LLP
111 Monument Circle, Suite 2700
Indianapolis, IN  46204
(317) 684-5000; (317) 684-5173 (Fax)
JMayes@boselaw.com
PZimmerly@boselaw.com
MWohlford@boselaw.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on January 11, 2022, a copy of the foregoing was filed electronically.

Notice of this filing will be sent to the following counsel by operation of the Court's electronic

filing system. Parties may access this filing through the Court's system.

| | |
|---|---|
| Kenneth J. Falk, Esq.<br>Stevie J. Pactor, Esq.<br>ACLU of Indiana<br>1031 East Washington Street<br>Indianapolis, IN  46202<br>kfalk@aclu-in.org<br>spactor@aclu-in.org | Kathleen Bensberg, Esq.<br>Indiana Legal Services, Inc.<br>1200 Madison Avenue<br>Indianapolis, IN  46225<br>Kathleen.bensberg@ilsi.net<br><br>Megan Stuart, Esq.<br>Indiana Legal Services<br>214 South College Avenue, 2nd Floor<br>Bloomington, IN  47404<br>Megan.stuart@ilsi.net |

/s/ *Philip R. Zimmerly*
Philip R. Zimmerly

4290464

23