UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| B.E.; *et al.*, | ) |
|       Plaintiffs, | ) ) ) |
| v. | ) ) ) Case No. 2:21-cv-00415-JRS-MG |
| VIGO COUNTY SCHOOL CORPORATION, *et al.*, | ) ) ) |
|       Defendants. | ) ) ) |

**AMICUS BRIEF OF INDIANA AND 13 OTHER STATES IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

THEODORE E. ROKITA
Attorney General of Indiana

THOMAS M. FISHER
Solicitor General

JULIA C. PAYNE
MELINDA R. HOLMES
Deputy Attorneys General

Office of the Attorney General
IGC South, Fifth Floor
Indianapolis, Indiana 46204
Tel: (317) 232-6255
Fax: (317) 232-7979
Email: Tom.Fisher@atg.in.gov

*Counsel for Amici States*

**TABLE OF CONTENTS**

INTEREST OF AMICI STATES ................................................................................................. 1

ARGUMENT .................................................................................................................................. 1

I.     *Whitaker*, *J.A.W.*, and *Bostock* Do Not Control this Case ..................................................... 1

II.    The School's Bathroom, Locker Room, and Pronoun Policies Do Not Violate Title IX .... 3

       A.  Requiring students to use bathrooms and locker rooms consistent with their biological sex does not violate Title IX ........................................................................ 3

       B.  Allowing teachers to refer to students using ordinary pronouns (*i.e.,* those consistent with the students' biological sex) does not violate Title IX ......................... 4

III.   The School's Policy Does Not Violate the Equal Protection Clause .................................. 5

       A.  Transgender individuals are not a suspect or quasi-suspect class under the Equal Protection Clause ................................................................................................. 5

       B.  Requiring students to use bathrooms consistent with their biological sex is not impermissible sex discrimination under the Equal Protection Clause .......................... 7

       C.  Allowing teachers to refer to students using ordinary pronouns is not impermissible sex discrimination under the Equal Protection Clause ................................................ 10

CONCLUSION ............................................................................................................................. 13

ADDITIONAL COUNSEL .......................................................................................................... 14

**INTEREST OF AMICI STATES**

The States of Indiana, Alabama, Alaska, Arkansas, Georgia, Idaho, Kentucky, Mississippi, Montana, Nebraska, South Carolina, South Dakota, Tennessee, and West Virginia respectfully submit this brief as *amici curiae* in support of Defendants.

Amici States all have public school and public university systems that receive federal funding under Title IX. They have a strong interest in the efficient operation of these educational institutions and in protecting the health, safety, welfare, and privacy of all students. Many are involved in a multistate lawsuit challenging the federal government's guidance interpreting Title IX's prohibition of sex discrimination to cover discrimination on the basis of sexual orientation and gender identity. *See Tennessee v. U.S. Dep't of Educ.*, No. 3:21-cv-00308 (E.D. Tenn.). In a "public school environment[,] . . . the State is responsible for maintaining discipline, health, and safety." *Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls*, 536 U.S. 822, 830 (2002). Requiring schools to allow some students to use the restrooms or locker rooms of the opposite biological sex threatens the privacy (and safety) of all students. And mandating that every teacher remember and use the preferred pronoun of every student, regardless of biological sex, interferes with school operations and educational missions and is tantamount to mandating that teachers speak each student's preferred language. No law imposes such a requirement.

For these reasons, Amici States respectfully request that this Court deny Plaintiffs' motion for preliminary injunction.

**ARGUMENT**

**I.     *Whitaker*, *J.A.W.*, and *Bostock* Do Not Control this Case**

No controlling precedent holds that Title IX or the Equal Protection Clause requires schools to permit students to use whatever bathrooms or locker rooms they like. Plaintiffs rely on *Whitaker by Whitaker v. Kenosha Unified School District No. 1 Board of Education*, 858 F.3d 1034, 1046

1

(7th Cir. 2017), to claim otherwise, ECF No. 22 at 17–19, but that case relied on an incorrect, ultra-lenient "better than negligible" merits test for preliminary injunctions. The Supreme Court has rejected that standard, *Nken v. Holder*, 556 U.S. 418, 434 (2009), and *Whitaker* has since been abrogated. *See Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020) (recognizing abrogation of *Whitaker* because the Supreme Court "expressly disapproved" the "better than negligible" standard). Under the proper standard, "a mere possibility of success is not enough." *Id.* Instead, the plaintiff "must make a strong showing that she is likely to succeed on the merits." *Id. Whitaker* never reached final judgment, and the Seventh Circuit's preliminary assessment that "sex" under Title IX has a "better than negligible" chance of meaning gender identity is not sufficient to control here. The question is whether these plaintiffs can make a "strong showing" that is what "sex" means in Title IX. They cannot.[1]

Nor does *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), provide the answer here. That case addressed Title VII, not Title IX or Equal Protection. The Court there expressly held that "other federal or state laws that prohibit sex discrimination" were not "before [the Court]" and refused to "prejudge any such question" about what those statutes require. *Id.* at 1753. As the Sixth Circuit recently held, because "Title VII differs from Title IX in important respects[,] . . . it does not follow that principles announced in the Title VII context automatically apply in the Title IX context." *Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021). *Bostock* also did not purport to address any constitutional claims.

---

[1] Plaintiffs also rely on *J.A.W. v. Evansville Vanderburgh School Corp.*, but that case relies on *Whitaker*'s application of the incorrect standard and is not binding on this Court in any event. 396 F. Supp. 3d 833, 841 (S.D. Ind. 2019).

2

Consequently, the permissibility under Title IX and the Fourteenth Amendment of separating restrooms and locker rooms based on biological sex and allowing teachers to use ordinary pronouns (*i.e.*, those consistent with students' biological sex) remain open questions for this Court.

## II. The School's Bathroom, Locker Room, and Pronoun Policies Do Not Violate Title IX

### A. Requiring students to use bathrooms and locker rooms consistent with their biological sex does not violate Title IX

When the Supreme Court in *Bostock* disclaimed ruling on "bathrooms, locker rooms, or anything else of the kind," *Bostock v. Clayton County*, 140 S. Ct. 1731, 1753 (2020), it was not simply taking care to avoid deciding more than necessary. Bathrooms and locker rooms differ from employment in at least one critical respect: sex-based employment discrimination is prohibited by federal statute, whereas sex-based discrimination in bathrooms and locker rooms is both permitted and expected by federal statute.

Unlike Title VII, Title IX expressly allows sex-based separation in certain settings. Title IX, enacted as part of the Educational Amendments of 1972, provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). It also explicitly provides that "nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes." *Id.* § 1686. And its enforcing regulations specifically provide that "[a] recipient may provide separate toilet, locker room, and shower facilities on the basis of sex." 34 C.F.R. § 106.33.

The ordinary meaning of "sex" at the time that Title IX was enacted was biological sex, not gender identity. *See Adams v. Sch. Bd. of St. Johns Cnty.*, 3 F.4th 1299, 1322 (11th Cir.) (Pryor, C.J., dissenting) (collecting dictionary definitions from the time of enactment), *reh'g en banc*

3

*granted*, 9 F.4th 1369 (11th Cir. 2021); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 632–33 (4th Cir. 2020) (Niemeyer, J., dissenting) (same). And the statutory context of Title IX confirms that its drafters understood sex as a binary concept. *See* 20 U.S.C. § 1681(a)(2) (describing how an institution may change "from . . . admit[ting] only students of one sex . . . to . . . admit[ting] students of both sexes"); *id.* § 1681(a)(6)(B) (referring to "Men's" and "Women's" associations and organizations for "Boy[s]" and "Girls," "the membership of which has traditionally been limited to persons of one sex").

"Not long ago, a suit challenging the lawfulness of separating bathrooms on the basis of sex would have been unthinkable." *Adams*, 3 F.4th at 1321 (Pryor, C.J., dissenting). The Supreme Court has held that "[p]hysical differences between men and women . . . are enduring" and that the "'two sexes are not fungible'" but rather have "'inherent differences.'" *United States v. Virginia*, 518 U.S. 515, 533 (1996) (quoting *Ballard v. United States*, 329 U.S. 187, 193 (1946)). An interpretation of Title IX that prohibits separating bathrooms and locker rooms by biological sex would require schools do away with sex-specific bathrooms and locker rooms entirely, not only for transgender students. Such an interpretation would be contrary to both common sense and the "well-established privacy interests in using the bathroom away from the opposite sex." *Adams*, 3 F.4th at 1321 (Pryor, C.J., dissenting).

A school does not violate Title IX by requiring students to use bathrooms and locker rooms consistent with their biological sex. Indeed, Title IX and its enforcing regulations expressly permit such a policy.

### B. Allowing teachers to refer to students using ordinary pronouns (*i.e.,* those consistent with the students' biological sex) does not violate Title IX

Title IX also does not prohibit a school from allowing teachers to refer to students using ordinary pronouns consistent with the students' biological sex. Plaintiffs argue that the school's

4

refusal to "direct school employees to refer to the plaintiffs by the names and pronouns that reflect their male gender . . . subject[s] the plaintiffs to differential treatment on the basis of their transgender status, in violation of Title IX." ECF No. 22 at 22–23 (citing 34 C.F.R. § 106.31(b)(2), (4)). But the school subjects Plaintiffs to the same treatment as all other students: it allows teachers to refer to all students by pronouns consistent with their biological sex.

The Sixth Circuit has held that Title IX does not require schools to command teachers to use pronouns consistent with a student's gender identity; indeed, doing so could expose the school to liability under the First Amendment. *Meriwether v. Hartop*, 992 F.3d 492, 511 (6th Cir. 2021). Plaintiffs rely on two district court cases, but neither supports their position. First, Judge Magnus-Stinson's decision in *Kluge v. Brownsburg Community School Corp.* specifically left open this question, explaining that "[w]hether [a lawsuit by a transgender student under Title IX] would ultimately have been successful is not for the Court to decide at this juncture." No. 1:19-cv-2462, 2021 WL 2915023, at *22 (S.D. Ind. July 12, 2021). Second, the Southern District of Ohio's pre-*Meriwether* decision in *Board of Education of the Highland Local School District v. U.S. Department of Education* includes no assessment of plaintiff's Title IX claim concerning the use of pronouns; it focuses instead on the bathroom issue. 208 F. Supp. 3d 850, 865–71 (S.D. Ohio 2016).

Bottom line: The School's policy to permit teachers to use ordinary pronouns consistent with students' biological sex is sex-neutral and does not implicate Title IX.

### III.  The School's Policy Does Not Violate the Equal Protection Clause

#### A. Transgender individuals are not a suspect or quasi-suspect class under the Equal Protection Clause

In a footnote, Plaintiffs propose that "transgender individuals are part of at least a quasi-suspect class," ECF No. 22 at 25 n.7, principally citing *Grimm v. Gloucester County School Board*, 972 F.3d 586, 607 (4th Cir. 2020). But the Supreme Court has been reluctant to recognize new

5

suspect and quasi-suspect classes. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 441–42 (1985) (declining to recognize mental disability as a quasi-suspect class and explaining the courts "have been very reluctant" to designate new such classes).

The last time the Seventh Circuit recognized a new quasi-suspect class was in *Baskin v. Bogan*, which held that homosexuals were a quasi-suspect class under the Equal Protection Clause. 766 F.3d 648, 654 (7th Cir. 2014). But that analysis was not borne out by the Supreme Court, which, rather than designating homosexuals a quasi-suspect class, instead recognized same-sex marriage as a fundamental right. *Obergefell v. Hodges*, 576 U.S. 644, 675 (2015). Even *Whitaker* did not go so far as to recognize transgender status as a protected class. *Whitaker by Whitaker v. Kenosha Unified School District No. 1 Board of Education*, 858 F.3d 1034, 1051 (7th Cir. 2017) ("[T]his case does not require us to reach the question of whether transgender status is per se entitled to heightened scrutiny.").

More fundamentally, any claim of protected status for transgenderism runs headlong into the Supreme Court's longstanding view that "sex, like race and national origin, is an immutable characteristic determined solely by the accident of birth." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973). It is the very immutability of sex that keeps it protected from discrimination via heightened scrutiny (in some contexts). If Plaintiffs are claiming protected status because transgender people have historically been subjected to bathroom and locker room discrimination, they are at war with the status of sex—which is precisely what defines bathroom and locker room segregation—as an immutable characteristic.

Perhaps Plaintiffs instead only mean to say that transgender people have historically been subjected to discrimination in a variety of contexts, but not specifically in the segregation of bathrooms and locker rooms. If so, that admission means that the school's policies do not target

transgender persons as such (because they target sex rather than gender identity) and merely have a disparate negative impact on transgender people. But if so, the status of transgender people as a class under the Equal Protection Clause is irrelevant, for Plaintiffs' claims must fail for a different reason—because the Equal Protection Clause protects only against intentional discrimination, not disparate impact. *See Washington v. Davis*, 426 U.S. 229, 239 (1976).

Either way, Vigo County is not required to justify its ordinary, common-sense sex-segregated bathroom and locker rooms under a heightened-scrutiny standard.

### B. Requiring students to use bathrooms consistent with their biological sex is not impermissible sex discrimination under the Equal Protection Clause

Regardless, the Supreme Court has long recognized that, because "physical differences between men and women . . . are enduring," "[t]he heightened review standard our precedent establishes does not make sex a proscribed classification." *United States v. Virginia*, 518 U.S. 515, 533 (1996). Sometimes, differential treatment based on sex is justified, even laudable. As Justice Thurgood Marshall once observed, "[a] sign that says 'men only' looks very different on a bathroom door than a courthouse door." *City of Cleburne*, 473 U.S. at 468–69 (Marshall, J., concurring in judgment in part and dissenting in part).

Indeed, in the Supreme Court's landmark equal-protection decision requiring Virginia Military Institute to admit women, the Court, in an opinion written by Justice Ginsburg, recognized that "[a]dmitting women to VMI would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements." *Virginia*, 518 U.S. at 550 n.19. And the Seventh Circuit has expressly recognized that "the law tolerates same-sex restrooms . . . to accommodate privacy needs." *Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 913 (7th Cir. 2010). *See also* W. Burlette Carter, *Sexism in the "Bathroom Debates"*, 37 Yale L. & Pol'y Rev.

7

227, 287–88 (2018) ("Sex-separation [in bathrooms] dates back as far as written history will take us.").

Perhaps for this reason, Plaintiffs do not purport to challenge the school's ability to provide separate bathroom and locker room facilities to male and female students. Instead, they challenge only the school's decision not to allow biological females who identify as males to use the restrooms and locker rooms designated for biological male students. But Plaintiffs are "not, in fact, similarly situated to the biologically male students who use[] those restrooms"; critically, they "remain[] anatomically different from males." *Grimm*, 972 F.3d at 636 (Niemeyer, J., dissenting); *see also Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) ("The Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike."). Put another way, "[b]ecause such anatomical differences are at the root of why communal restrooms are generally separated on the basis of sex," the school's policy is not really sex discrimination at all. *Grimm*, 972 F.3d at 636 (Niemeyer, J., dissenting).

At bottom, Plaintiffs' claim is that they should be allowed to use the restrooms consistent with their gender identity, regardless of anatomy and biology, because anatomy and biology carry no meaningful differences. But this argument is, in fact, a challenge to sex-segregated bathrooms and locker rooms. If anatomy and biology are unimportant, what grounds exist for sex-segregated bathrooms and locker rooms in the first place?

Alternatively, one could view the same point as a matter of the school's compelling interest in protecting the privacy of all students. Plaintiffs do not appear to contend that this privacy interest is unimportant, but instead argue that "such justifications are not served by banning [Plaintiffs] from the boys['] restrooms as they had utilized them without incident until staff prohibited them

8

from doing so." ECF No. 22 at 26. But the mere presence of a member of the opposite sex in a restroom or locker room is a violation of privacy, regardless of whether any "incident" occurs. And when it comes to being undressed, the Supreme Court itself has recognized that "adolescent vulnerability intensifies the patent intrusiveness of the exposure." *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 375 (2009). As Justice Ginsburg observed, this vulnerability is especially heightened when teenage girls are involved: "[A] girl who's just the age where she is developing, whether she has developed a lot . . . or . . . has not developed at all (might be) embarrassed about that." Joan Biskupic, *Ginsburg: Court Needs Another Woman*, USA Today, *available at* https://usatoday30.usatoday.com/news/washington/judicial/2009-05-05-ruthginsburg_N.htm. And of course, the school could not allow transgender males to use the boys' bathroom while prohibiting transgender females from doing the same. Thus, "[s]eparate places to disrobe, sleep, [and] perform personal bodily functions are permitted, in some situations required, by regard for individual privacy." Ruth Bader Ginsburg, *The Fear of the Equal Rights Amendment*, Wash. Post, Apr. 7, 1975, at A21.

    This point is demonstrated by the obvious implications of a change in school policy: The school could not simply allow *two* students to use bathrooms consistent with their gender identity without allowing *other* students to do the same. Because, under Plaintiffs' theory, students need not have gender reassignment surgery or change their gender identity on their birth certificate, the school would have no way to distinguish students with legitimate claims of gender dysphoria from students using gender dysphoria as an excuse to gain access to locker rooms for the opposite sex. This enforcement problem would lead to privacy (and potentially safety) concerns for all students wishing to use restrooms and locker rooms away from the prying eyes of a member of the opposite sex.

For these reasons, the school's policy of requiring students to use restrooms and locker rooms consistent with their biological sex is substantially related to the school's important interest in protecting student privacy and therefore, does not violate the Equal Protection Clause.

### C. Allowing teachers to refer to students using ordinary pronouns is not impermissible sex discrimination under the Equal Protection Clause

Allowing teachers to refer to students by ordinary pronouns—again, pronouns consistent with the students' biological sex—is simply a matter of permitting ordinary English language usage, not impermissible discrimination based on sex or gender identity. Once again, Plaintiffs do not challenge their teachers' decisions to use sex-based pronouns at all, merely how they use such pronouns in response to individual student preferences. But permitting ordinary English language usage is a neutral standard that treats Plaintiffs the same as all other students, with the result that, for teachers who use ordinary pronouns, all students are referred to by pronouns consistent with their biological sex.

Really, Plaintiffs' claim amounts to a challenge to the English language itself. "Under established English usage, two sets of sex-specific singular personal pronouns are used to refer to someone in the third person (he, him, and his for males; she, her, and hers for females)." *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1782 (2020) (Alito, J., dissenting). Plaintiffs call into question the very meaning of these pronouns by demanding that all teachers use—with reference to Plaintiffs, at least—pronouns inconsistent with their biological sex. To begin, such demands amount to bespoke tailoring of the language, calling to mind Humpty-Dumpty's famous line, "When I use a word . . . it means just what I choose it to mean—neither more nor less." Lewis Carroll, *Through the Looking Glass* (1871). But for language to be effective at facilitating communication, users must agree upon the meaning of words. *See, e.g.*, Ludwig Wittgenstein, *Philosophical Investigations* (1953) ("[T]he meaning of a word is its use in the language."). That rather banal proposition

10

Case 2:21-cv-00415-JRS-MG   Document 35   Filed 01/11/22   Page 13 of 16 PageID #: 360

carries a significant implication for plaintiffs' claim: one cannot, in the name of individual liberty, insist that others use language contrary to ordinary usage: "What is above all needed is to let the meaning choose the word, and not the other way about." George Orwell, *Politics and the English Language*, Horizon (Apr. 1946), *available at* https://www.orwellfoundation.com/the-orwell-foundation/orwell/essays-and-other-works/politics-and-the-english-language/.

But that's not all. If Plaintiffs have their way, some individuals (transgender and others) will wish to use one of the "several different sets of gender-neutral pronouns" that "have now been created" for "individuals who do not identify as falling into either of the two traditional categories." *Bostock*, 140 S. Ct. at 1782 (Alito, J., dissenting). For example, as Justice Alito observed, some people prefer the pronouns "xe," "ze," or "hir." *Id.* at 1782 n.58 (Alito, J., dissenting) (citing University of Wisconsin Milwaukee Lesbian, Gay, Bisexual, Transgender, Queer Plus (LGBTQ+) Resource Center, Gender Pronouns (2020), https://uwm.edu/lgbtrc/support/gender-pronouns/). Many more abound, such as ip, id, thon, vim, vit, um, sis, sim, sey, sem, sher, shim, ti, tis, itself, hi, hem, he'r, him'er, and his'er—more than 250 already, "and more are surely on the way." Dennis Baron, *What's Your Pronoun*? (2020) at 111. And the practice of pronoun neologism is not limited to transgender people: "[A]nyone of any gender can use any pronouns that fit for them. Everyone has pronouns, not just transgender, nonbinary, or intersex people." *Pronouns: A How-To*, https://www.diversitycenterneo.org/about-us/pronouns/.

In this wonderland of personal pronouns based on choice rather than anatomy, biology and accepted usage, requiring teachers to remember and use each student's preferred personal pronouns is tantamount to requiring teachers to use a new language when communicating with at least some students. Language may be fluid, but changes happen gradually over time by ordinary usage, not by constitutional mandate. Indeed, while various gender-neutral pronouns have been proposed

over the past 150 years, none have caught on in the English language. *See* Dennis Baron, *The Gender-Neutral Pronoun: 150 Years Later, Still an Epic Fail*, OUP Blog (Aug. 26, 2010), https://blog.oup.com/2010/08/gender-neutral-pronoun/.

    Whatever else the Equal Protection Clause demands, it does not require public school teachers to learn and use a student's preferred language, whether it is a traditional one (such as Spanish or Chinese) or something of more contemporary vintage. It is one thing to debate whether good manners require use of another person's preferred pronouns; it is quite another to insist that the *Constitution* requires it. Equal protection doctrine concerns itself with justifications for policies that create classifications. *Virginia*, 518 U.S. at 531 ("Parties who seek to defend gender-based government action must demonstrate an 'exceedingly persuasive justification' for that action."). A policy that teachers may adhere to ordinary English usage does not create classifications, based on either sex or gender identity—it is a neutral principle. Concluding otherwise simply because English pronouns distinguish between genders would have implications not only for gender identity claims, but also sex discrimination claims brought by *any* students who reject the language's gender distinctions.

    Regardless, the school's decision to allow teachers to refer to students using pronouns consistent with their biological sex is substantially related to the school's important interests in administrative efficiency. Schools that impose special pronoun policies must spend resources training teachers and staff in a new and developing pronoun language and in policing compliance. Some schools may be willing to invest those resources, others may not. Assessing those costs and deciding whether to incur them is within a school's permissible range of administrative decisions. Consequently, the policy at issue here does not violate the Equal Protection Clause.

## CONCLUSION

The Court should deny the Motion for Preliminary Injunction.

        Respectfully submitted,

        THEODORE E. ROKITA
        Indiana Attorney General

By:  */s/ Thomas M. Fisher*
        Thomas M. Fisher
        Solicitor General

        Julia C. Payne
        Melinda R. Holmes
        Deputy Attorneys General

        Office of the Indiana Attorney General
        IGC-South, Fifth Floor
        302 West Washington Street
        Indianapolis, Indiana 46204-2770
        Telephone: (317) 232-6255
        Fax: (317) 232-7979
        Email: Tom.Fisher@atg.in.gov

## ADDITIONAL COUNSEL

STEVE MARSHALL
Attorney General
State of Alabama

CLYDE SNIFFEN, JR.
Attorney General
State of Alaska

LESLIE RUTLEDGE
Attorney General
State of Arkansas

CHRISTOPHER M. CARR
Attorney General
State of Georgia

LAWRENCE WASDEN
Attorney General
State of Idaho

DANIEL CAMERON
Attorney General
Commonwealth of Kentucky

LYNN FITCH
Attorney General
State of Mississippi

AUSTIN KNUDSON
Attorney General
State of Montana

DOUG PETERSON
Attorney General
State of Nebraska

ALAN WILSON
Attorney General
State of South Carolina

JASON R. RAVNSBORG
Attorney General
State of South Dakota

HERBERT H. SLATERY III
Attorney General
State of Tennessee

PATRICK MORRISEY
Attorney General
State of West Virginia