UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| B. E., | ) |
| S. E., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| VIGO COUNTY SCHOOL CORPORATION, | ) |
| PRINCIPAL, TERRE HAUTE NORTH | ) |
| VIGO HIGH SCHOOL, | ) |
| | ) |
| Defendants. | ) |

No. 2:21-cv-00415-JRS-MG

**Order on Motion for Preliminary Injunction**

2022 marks fifty years of Title IX and its prohibition of discrimination "on the basis of sex" in educational programs and activities receiving federal financial assistance. 20 U.S.C. § 1681(a). Plaintiffs B.E. and S.E., transgender boys attending Terre Haute North Vigo High School, moved for a preliminary injunction, (ECF No. 12), contending that the School's refusal to allow them to use the male restroom and locker room violates Title IX and the Equal Protection Clause. Because the Court finds that Plaintiffs have shown a likelihood of success on the merits of their Title IX claim, and that the other requirements of a preliminary injunction are satisfied, the Court grants the Motion for a Preliminary Injunction.

**Background**

Plaintiffs were designated female at birth but have identified as male since they were about eleven years old; they are now fifteen. (B.E. Decl. ¶¶ 2–5, ECF No. 22-4; S.E. Decl. ¶¶ 2–5, ECF No. 22-5.) They use names and pronouns that reflect their

male identities, wear masculine clothes, and have masculine haircuts, all of which leads others to perceive them—correctly, in Plaintiffs' view—as boys.  (B.E. Decl. ¶¶ 6–8, ECF No. 22-4; S.E. Decl. ¶¶ 6–8, ECF No. 22-5.)  Plaintiffs have begun gender-affirming testosterone therapy, which initiates anatomical and physiological changes consistent with the male gender, such as deepening of the voice and the growth of facial hair.  (Dr. James D. Fortenberry Suppl. Decl. ¶¶ 7–8, ECF No. 43-6; B.E. Decl. ¶ 24, ECF No. 22-4.)  Plaintiffs also have legally changed their names and gender identification, and their birth certificates have been amended to reflect their masculine names and male gender.[1]  (L.E. Suppl. Decl. ¶¶ 2–3, ECF No. 43-9; *id.* at Ex. 1–2.)

Plaintiffs have been diagnosed with gender dysphoria, a condition defined by the American Psychiatric Association as "a marked incongruence between one's experienced/expressed gender and assigned gender."  (Fortenberry Decl. ¶¶ 21, 36, ECF No. 22-2 (citing Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders (5th ed. 2013)); B.E. Decl. ¶ 19, ECF No. 22-4; S.E. Decl. ¶ 19, ECF No. 22-5.)  Untreated gender dysphoria can result in "significant distress, clinically significant anxiety and depression, self-harming behaviors, substance abuse, and suicidality."  (Fortenberry Decl. ¶ 18, ECF No. 22-2.)  Specifically, denial of the use of toilet facilities consistent with an individual's expressed gender is an "ever-present source of distress and anxiety," which is linked to "increases in self-harming

---

[1] The Court understands that Defendants have agreed to refer to Plaintiffs by their male names and male pronouns, and only the restroom and locker room issues remain for the Court.  (Mason Dep. 19–20, ECF No. 43-1; Pls.' Reply 2 n.2, ECF No. 44.)

behaviors including suicidality." (*Id.* ¶ 31.)  The principal treatment of gender dysphoria is "to allow the young person full expression of their experienced gender identity," which includes allowing individuals to express their gender "with social behaviors consistent with their experienced gender." (*Id.* ¶¶ 26, 29.)  Hormone therapy can also help. (*Id.* ¶ 26.)  Allowing the person to express themselves in a manner consistent with their gender identity is "an essential component of amelioration of gender dysphoria that is essential to future mental health," and support in doing so "at least partially ameliorates" gender dysphoria and its negative consequences. (*Id.* ¶¶ 28, 29; Dr. Janine M. Fogel Decl. ¶¶ 21–23, ECF No. 22-1.)

Plaintiffs used the boys' bathrooms at the beginning of the school year without incident. (B.E. Decl. ¶¶ 10–11, ECF No. 22-4; S.E. Decl. ¶¶ 10–11, ECF No. 22-5; Stacy Mason Dep. 29–30, ECF No. 43-1.)  A school employee noticed their use and reported it. (B.E. Decl. ¶¶ 11–14, ECF No. 22-4.)  The vice principal then instructed Plaintiffs that they can only use the girls' bathrooms or the unisex bathroom in the health office and that they may be disciplined if they use the boys' bathrooms. (*Id.*; Mason Dep. 39, ECF No. 43-1.)  It is the School's position that Plaintiffs cannot use the boys' facilities "without surgical or anatomical change." (Mason Dep. 18, 22, 41–42, ECF No. 43-1.)

Plaintiffs have been using the health office bathroom because using the girls' bathroom "feels wrong," makes Plaintiffs extremely anxious and upset, and causes confusion among peers who do not know that Plaintiffs are transgender, forcing Plaintiffs to explain why they are using the girls' bathroom. (B.E. Decl. ¶¶ 18, 22–

23, ECF No. 22-4; S.E. Decl. ¶¶ 18, 22–23, ECF No. 22-5.)  The health office bathroom is far away from Plaintiffs' classes, which makes them late for class when they need to use the restroom between classes and causes them to miss more class when they need to use the restroom during class.  (B.E. Decl. ¶ 26, ECF No. 22-4; S.E. Decl. ¶ 26, ECF No. 22-5.)  Similarly, Plaintiffs arrive late, and separately from other students, to gym class, as they change in the health office bathroom.  (B.E. Decl. ¶ 30, ECF No. 22-4; S.E. Decl. ¶ 30, ECF No. 22-5.)  Vigo County School Corporation's Director of Secondary Education, Stacy Mason, is not aware of any other students who use the health office bathroom, other than students who are in the nurse's office for a health issue. (Mason Dep. 35–36, ECF No. 43-1.)  There have also been a few instances when the health office bathroom has been locked, and Plaintiffs had to "hold it" while they waited for it to be unlocked.  (B.E. Dep. 35–36, ECF No. 29-3; S.E. Dep. 21–22, ECF No. 29-2.)  As a result, Plaintiffs try to avoid going to the bathroom at all when at school.  (B.E. Decl. ¶ 29, ECF No. 22-4; S.E. Decl. ¶ 29, ECF No. 22-5.)

This is compounded by Plaintiffs' lifelong gastrointestinal problems, which require Plaintiffs to use the bathroom frequently and urgently and to take laxatives. (B.E. Decl. ¶ 20, ECF No. 22-4; S.E. Decl. ¶ 20, ECF No. 22-5; B.E. Dep. 27, ECF No. 29-3.)  The Parties dispute how frequently Plaintiffs have had restroom accidents at school, but they agree that at least once in high school, Plaintiffs' mother brought S.E. a change of clothes because of an accident.  (L.E. Dep. 76–83, ECF No. 29-1.) Additionally, Plaintiffs' mother once picked B.E. up from school because B.E.'s

stomach hurt from "holding it."  (L.E. Dep. 76–83, ECF No. 29-1; B.E. Dep. 33–35, ECF No. 29-3.)

## Legal Standard

A plaintiff seeking a preliminary injunction must show that "(1) they will suffer irreparable harm in the absence of an injunction, (2) traditional legal remedies are inadequate to remedy the harm, and (3) they have some likelihood of success on the merits." *Camelot Banquet Rooms, Inc. v. U.S. Small Bus. Admin.*, 24 F.4th 640, 644 (7th Cir. 2022).  If those elements are shown, the court must "balance the harm" the plaintiff would suffer if an injunction is denied against the harm the opposing party would suffer if one is granted, "and the court must consider the public interest, which takes into account the effects of a decision on non-parties."  *Id.*

## Discussion

Plaintiffs assert that Defendants' actions violate both Title IX and the Equal Protection Clause of the Fourteenth Amendment.  (Compl. ¶ 1, ECF No. 1.)  Because the Court agrees that Plaintiffs are likely to succeed on the merits of their Title IX claim, the Court does not address the Equal Protection Clause argument.  *See, e.g.*, *ISI Int'l, Inc. v. Borden Lander Gervais LLP*, 256 F.3d 548, 552 (7th Cir. 2001), *as amended* (July 2, 2001), ("[F]ederal courts are supposed to do what they can to avoid making constitutional decisions, and strive doubly to avoid making unnecessary constitutional decisions.").

### A. Likelihood of Success on the Merits

Title IX provides that no person "shall, on the basis of sex, be excluded from

participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."   20 U.S.C. § 1681(a).   Defendants admit that they receive federal funding and therefore are covered by Title IX.  (Answer ¶ 44, ECF No. 27.)

At the heart of the Parties' dispute are the Supreme Court's decision in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), and the Seventh Circuit's decision in *Whitaker v. Kenosha Unified School District No. 1 Board of Education*, 858 F.3d 1034 (7th Cir. 2017), *abrogated on other grounds by Illinois Republican Party v. Pritzker*, 973 F.3d 760 (7th Cir. 2020).

*Bostock* established that Title VII's prohibition of discrimination "because of such individual's . . . sex" encompasses discrimination because an individual is homosexual or transgender.  *Bostock*, 140 S. Ct. at 1741–43; 42 U.S.C. § 2000e-2(a)(1).  More precisely, the Court held that an employer violates Title VII when it fires an individual for being homosexual or transgender.  *Bostock*, 140 S. Ct. at 1753.  The Court reasoned that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex;" "homosexuality and transgender status are inextricably bound up with sex."  *Id.* at 1741–42.

Three years before *Bostock*, the Seventh Circuit decided *Whitaker*.  There, the court affirmed the issuance of a preliminary injunction enjoining a school district from denying a transgender boy access to the boys' restroom.  *Whitaker*, 858 F.3d at 1042, 1055.  The court found the plaintiff demonstrated a likelihood of success on the

merits of his Title IX claim because a "policy that requires an individual to use a bathroom that does not conform with his or her gender identity punishes that individual for his or her gender non-conformance, which in turn violates Title IX." *Id.* at 1049.  Further, such a policy subjects a transgender student "to different rules, sanctions, and treatment than non-transgender students, in violation of Title IX." *Id.* at 1049–50; *see* 34 C.F.R. § 106.31(b)(4) (prohibiting institutions covered by Title IX from "[s]ubject[ing] any person to separate or different rules of behavior, sanctions, or other treatment").  However, the *Whitaker* court applied the wrong standard for evaluating whether preliminary injunctive relief was warranted.  858 F.3d at 1046. The court stated that a plaintiff seeking a preliminary injunction need only show that his chance to succeed on his claim was "better than negligible," *id.*—a standard that has been "retired by the Supreme Court," *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020).

In Defendants' view, this error renders *Whitaker* meaningless, and *Whitaker* "should have no precedential value here."  (Defs.' Resp. 13, ECF No. 30.)  Defendants also stress that *Bostock* "expressly declined" to reach the issue of sex-segregated bathrooms and locker rooms.  (*Id.* at 14.)  The crux of Defendants' argument is that *Bostock*'s determination that discrimination based on transgender status "necessarily entails discrimination based on sex," 140 S. Ct. at 1747, should not apply to Title IX, which expressly permits institutions to "provide separate toilet, locker room, and shower facilities on the basis of sex," 34 C.F.R. § 106.33.  Perhaps the Supreme Court will adopt that position when it takes up the issue in the Title IX context.  But until

then, this Court must follow *Whitaker* and, to the extent it supports *Whitaker* as relevant here, *Bostock*.

*Bostock* held, in clear terms, that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex."  140 S. Ct. at 1741.  Much like Title VII, Title IX prohibits discrimination "on the basis of sex."  20 U.S.C. § 1681(a).  It follows, then, that Title IX similarly prohibits discrimination because of an individual's transgender status. *Whitaker* reached this same conclusion, albeit under a different theory of sex discrimination.  858 F.3d at 1046–50 (finding transgender plaintiff was discriminated against for his failure to conform to sex-based stereotypes of the sex he was assigned at birth).

To be sure, the Court in *Bostock* explicitly noted that only Title VII was before it, and not "other federal or state laws that prohibit sex discrimination."  140 S. Ct. at 1753.  But courts have looked regularly to Title VII when interpreting Title IX.  *See, e.g.*, *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 616 n.1 (1999) (Thomas, J., dissenting) ("This Court has also looked to its Title VII interpretations of discrimination in illuminating Title IX . . . ."); *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 75 (1992) (applying Title VII's conception of sexual harassment as sex discrimination to Title IX claim); *Smith v. Metro. Sch. Dist. Perry Twp.*, 128 F.3d 1014, 1023 (7th Cir. 1997) (noting that "it is helpful to look to Title VII to determine whether the alleged sexual harassment is severe and pervasive enough to constitute illegal discrimination on the basis of sex for purposes of Title IX").  And the Supreme

Court's explanation of how discrimination on the basis of transgender status constitutes discrimination on the basis of sex applies just the same in the Title IX context.

It is true, however, that *Bostock* did not address the issue of "sex-segregated bathrooms, locker rooms, and dress codes." 140 S. Ct. at 1753; (Defs.' Resp. 14, ECF No. 30.) But while this might portend a different result when considering the issue squarely, it does not *sub silentio* overrule *Whitaker*, which addressed both Title IX and sex-segregated bathrooms. The defendants there made the same argument as Defendants here: Title IX specifically permits separate bathrooms based on sex, 34 C.F.R. § 106.33, so the school district can provide separate bathrooms based upon gender identity. (Kenosha Unified School District No. 1. Board of Education and Sue Savaglio-Jarvis' Appellate Brief at 11–12, 24, 26, *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 585 F.3d 1034 (7th Cir. 2017) (No. 16-3522), ECF No. 25-1; Kenosha Unified School District No. 1. Board of Education and Sue Savaglio-Jarvis' Reply Brief at 11–13, *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 585 F.3d 1034 (7th Cir. 2017) (No. 16-3522), ECF No. 71.) And the Seventh Circuit explicitly cited the regulation permitting institutions to do so. *Whitaker*, 858 F.3d at 1047 (citing 34 C.F.R. § 106.33). Nevertheless, the Seventh Circuit still concluded that denial of restroom access based on transgender status violates Title IX. *Id.* at 1047–51.

Of course, that is why the Parties dispute the significance of *Whitaker* after *Illinois Republican Party*. The impact of the subsequent abrogation is not totally

clear.  Plaintiffs argue *Whitaker* is still binding; Defendants say the Title IX issue remains an open one.  It seems clear, however, that cases abrogated in part do not lose all their value.  The Seventh Circuit has continued to look to abrogated cases, and it makes sense intuitively that a court's view is not rendered meaningless merely because it looked through the wrong lens.  *See, e.g.*, *Skiba v. Ill. Cent. R.R.*, 884 F.3d 708, 720 (7th Cir. 2018) (citing *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007), *abrogated on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)) (citing *Hemsworth* for support that remark was too remote to establish discriminatory intent, even though *Ortiz* expressly overruled *Hemsworth* for employing the wrong legal standard by separating "direct" from "indirect" evidence in employment discrimination framework).  That seems particularly true here, where the *Whitaker* court never indicated that the issue was a close one or hinted that the low threshold it applied was determinative.  Indeed, decisions of other district courts, while not binding on this Court, have concluded that *Whitaker* remains good law.  *See, e.g.*, *A.C. v. Metro. Sch. Dist. of Martinsville,* No. 1:21-cv-2965-TWP-MPB, 2022 WL 1289352, at *6 (S.D. Ind. Apr. 29, 2022) (recognizing that *Whitaker* "remains good law and thus is binding on this court"; granting preliminary injunction to a 13-year-old having no gastrointestinal problems and not having begun gender-affirming testosterone therapy), *appeal docketed*, No. 22-1786 (7th Cir. May 3, 2022); *see also D.T. v. Christ*, 552 F. Supp. 3d 888, 896 (D. Ariz. 2021) (citing *Whitaker*, among other cases, as support that discrimination against transgender people is discrimination based on sex).  At best for Plaintiffs,

*Whitaker* remains binding precedent on this Court; at worst, the Seventh Circuit has tipped its hand that it thinks Plaintiffs have the better of the argument.[2]  With the appeal of *A.C.* pending before the Seventh Circuit, these murky waters may soon become clear, but until then, and despite cogent arguments from Defendants, this Court is bound by *Whitaker*.

Further, other courts have agreed with the Seventh Circuit's assessment.  In *Grimm v. Gloucester County School Board*, the Fourth Circuit stated that after *Bostock*, it had "little difficulty" holding that a bathroom policy precluding a transgender boy from using the boys' restroom discriminated against him "on the basis of sex."  972 F.3d 586, 616 (4th Cir. 2020).  And it rejected the school board's argument—the same argument Defendants make here—that 34 C.F.R. § 106.33 allows for such a policy.  *Id.* at 618.  That is because transgender plaintiffs don't "challenge sex-separated restrooms;" rather, they challenge the "discriminatory exclusion" from the "sex-separated restroom matching [their] gender identity."  *Id.*;

---

[2] Defendants also argue that *Bostock* casts doubt upon *Whitaker* because *Whitaker* premised its finding of sex discrimination upon a sex-stereotyping theory, which "*Bostock* does not embrace." (Defs.' Resp. 13–15, ECF No. 30.)  This distinction misses the point.  Defendants' argument is that § 106.33 permits them "to separate toilet and locker room facilities on the basis of anatomical differences." (*Id.* at 15.)  Regardless of the theory on which the Seventh Circuit relied to find sex discrimination, it still decided that § 106.33 did not alter the conclusion that the transgender plaintiff was being subjected to impermissible discrimination.

Defendants also note that *Whitaker* addressed only access to bathrooms, not locker rooms. (Defs.' Resp. 9–10, ECF No. 30.)  The Court finds this distinction immaterial.  The reasoning applies the same to locker rooms, especially considering Plaintiffs would use the stalls in the locker room, just as they used the stalls in the restroom. (Pls.' Reply 4, ECF No. 44; B.E. Suppl. Decl. ¶ 6, ECF No. 43-7; S.E. Suppl. Decl. ¶ 6, ECF No. 43-8.)  Indeed, § 106.33, on which Defendants rely, applies to both bathrooms and locker rooms, so it follows that the outcome is the same for both.

*see also id.* ("All [§ 106.33] suggests is that the act of creating sex-separated restrooms in and of itself is not discriminatory—not that, in applying bathroom policies to students like [the plaintiff], the Board may rely on its own discriminatory notions of what 'sex' means.").  The Eleventh Circuit reached the same conclusion, also after *Bostock*, although the opinion was later vacated in an effort to reach only the Equal Protection issue.  *Adams v. Sch. Bd. of St. John's Cnty.*, 968 F.3d 1286, 1308 (11th Cir. 2020) ("Thus, the language of § 106.33 does not insulate the School Board from [the plaintiff's] discrimination claim based on his transgender status."), *vacated*, 3 F.4th 1299 (11th Cir. 2021), *rehearing en banc granted*, 9 F.4th 1369 (11th Cir. 2021).  Indeed, Defendants do not cite a district court or majority circuit court case adopting their position, and the Court can find none, which speaks to Plaintiffs' likelihood of success.  *Cf. Texas v. United States*, 201 F. Supp. 3d 810 (N.D. Tex. 2016) (noting that court's order was not addressing resolution of the "difficult policy issue" of transgender students' access to facilities but whether agencies followed proper administrative procedures in promulgating guidance).

As applicants for preliminary relief, Plaintiffs "bear[] a significant burden."  *Ill. Republican Party*, 973 F.3d at 763.  But they need not show proof by a preponderance or that they "definitely will win the case."  *Id.*  Plaintiffs have carried the requisite burden here.

## B. Other Requirements

Likelihood of success is not the end of the inquiry; Plaintiffs must demonstrate that the other preliminary injunction factors also weigh in their favor.  *Ill. Republican*

*Party*, 973 F.3d at 763.  While *Whitaker* might have employed the wrong standard as to the threshold showing of success, that has no bearing on *Whitaker*'s analysis of the remaining factors.  The Court turns to those factors with that in mind.

### 1. Irreparable Harm

Similar to *Whitaker*, the Court is presented with expert opinions that use of the boys' facilities is "integral" to Plaintiffs' "transition and emotional well-being" and that Plaintiffs will suffer irreparable harm absent preliminary relief.  *Whitaker*, 858 F.3d at 1045; (Fortenberry Decl. ¶ 31, ECF No. 22-2 ("The ability to be able to use toilet facilities consistent with one's experienced and expressed gender is a prime component of gender affirmation.  Being denied the use [of] gendered toilet facilities consistent with expressed gender is experienced as an ever-present source of distress and anxiety.")); (Fogel Decl. ¶ 27, ECF No. 22-1 (stating that "[t]he importance of being able to use restrooms" consistent with the person's gender identity "cannot be underestimated;" "Being forced to use restrooms that differ from the person's identity is a prime reminder that the transgender person is 'different,' and this undercuts the purpose and goal of social role transition and can exacerbate the negative consequences of gender dysphoria . . . and can have permanent negative consequences.").)[3]  Dr. Fortenberry noted that both Plaintiffs "have explicitly and consistently noted school-related distress associated with mis-gendering and with

---

[3] Defendants object to Dr. Fortenberry and Dr. Fogel's declarations "to the extent that they are based on inadmissible hearsay."  (Defs.' Resp. 20 n.4, ECF No. 30.)  It is not clear that the declarations are based on inadmissible hearsay, but even if they were, "hearsay can be considered in entering a preliminary injunction."  *S.E.C. v. Cherif*, 933 F.2d 403, 412 n.8 (7th Cir. 1991) (citing *Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 26 (1st Cir. 1986)).

restrictions on bathroom and locker room access" and that these experiences have "long-term influences on mental health, physical health, and overall wellbeing," including heightened risk for posttraumatic stress disorder, depression, life dissatisfaction, anxiety, and suicidality.[4] (Fortenberry Decl. ¶¶ 34–35, ECF No. 22-2.) He opined that Plaintiffs' "overall health and wellbeing is best served" by access to the male bathroom and locker facilities. (*Id.* ¶ 37.)

Defendants attempt to distinguish *Whitaker* by stating that unlike the plaintiff there, B.E. and S.E. have not "restricted their water intake" or "contemplated self harm as result of the restroom options offered to them." (Defs.' Resp. 19–20, ECF No. 30.) Plaintiffs have stated, however, that they try to avoid going to the bathroom at all, which is "very uncomfortable" and makes it hard to concentrate in class. (B.E. Decl. ¶ 29, ECF No. 22-4; S.E. Decl. ¶ 29, ECF No. 22-5.) And their mother testified that at least on one occasion, she picked up B.E. from school because B.E.'s stomach hurt from "holding it." (L.E. Dep. 76–83, ECF No. 29-1; B.E. Dep. 33–35, ECF No. 29-3.) Plaintiffs also stated that being excluded from the boys' facilities worsens their anxiety and depression, makes them feel isolated and punished for being who they are, and makes them not want to go to school. (B.E. Decl. ¶¶ 18, 31, ECF No. 22-4; S.E. Decl. ¶¶ 18, 31, ECF No. 22-5.) And Plaintiffs' mother testified that Plaintiffs have contemplated and carried out self-harm "because of what they are going through," although what they are "going through" likely encompasses more than just

---

[4] That Dr. Fortenberry based his opinions in part on conversations with the Plaintiffs for which he was not physically present—the conversations were relayed to him by the fellow he was supervising, Dr. Nomi Sherwin—does not change the Court's analysis. (*See* Defs.' Supp. R. ¶ 8, ECF No. 51.)

the School's stance. (L.E. Dep. 36, ECF No. 43-3.) While the circumstances here are not identical to those in *Whitaker*, they are sufficiently similar as to support a finding of irreparable harm.

Defendants also state that there is "no evidence that B.E. or S.E. have been ostracized or singled out for their use of the health office restroom." (Defs.' Resp. 20, ECF No. 30.) But as in *Whitaker*, the health office bathroom is not located near Plaintiffs' classrooms, and Plaintiffs are the only students who use it, other than students who are in the nurse's office for a health issue. (B.E. Suppl. Decl. ¶ 4, ECF No. 43-7; S.E. Suppl. Decl. ¶ 4, ECF No. 43-8; Mason Dep. 35–36, ECF No. 43-1.) Plaintiffs, too, are "faced with the unenviable choice between using a bathroom that would further stigmatize [them] and cause [them] to miss class time, or avoid use of the bathroom altogether at the expense of [their] health." *Whitaker*, 858 F.3d at 1045. The latter is not a viable option for Plaintiffs due to their gastrointestinal issues, and the former requires them to head to the health office—as effectively the only students who do so—and risk having an accident, while their peers use the nearby restrooms. (Mason Dep. 35–36, ECF No. 43-1; B.E. Decl. ¶ 27, ECF No. 22-4; S.E. Decl. ¶ 27, ECF No. 22-5.) Both Plaintiffs noted that this highlights that they are different than their peers; S.E. specifically testified that using the health office restroom made Plaintiffs "outcasts." (S.E. Dep. 18, ECF No. 29-2; B.E. Decl. ¶ 30, ECF No. 22-4; S.E. Decl. ¶ 30, ECF No. 22-5); *see Whitaker*, 585 F.3d at 1045 (plaintiff using restroom to which only he had access "further stigmatized" him, "indicating that he was 'different' because he was a transgender boy"). And all of this undermines the treatment for

Plaintiffs' gender dysphoria, the consequences of which have been detailed extensively by Dr. Fogel and Dr. Fortenberry.  In sum, like the plaintiff in *Whitaker*, Plaintiffs have shown that they will suffer irreparable harm in the absence of a preliminary injunction.

### 2.  Inadequate Legal Remedies

In concluding that the plaintiff in *Whitaker* had shown that there was no adequate remedy at law, the court rejected the school district's argument that any harm the plaintiff suffered could be remedied by monetary damages.  *Whitaker*, 858 F.3d at 1046.  The court cited the plaintiff's statement that he had contemplated suicide due to the school's position, as well as an expert's opinion that the school's actions were "directly causing significant psychological distress" and placed the plaintiff "at risk for experiencing life-long diminished well-being and life-functioning."  *Id.* at 1045–46.  The court concluded that there was no adequate remedy for "preventable 'life-long diminished well-being and life-functioning'" or for the potential harm of suicide.  *Id.*

Here, Defendants do not appear to even argue that there is an adequate remedy at law.  Regardless, while Plaintiffs have not explicitly stated that they have contemplated suicide because of the School's policy, the same risk of "preventable 'life-long diminished well-being and life-functioning'" is present.  Dr. Fortenberry noted Plaintiffs' "school-related distress associated with mis-gendering and with restrictions on bathroom and locker room access" and stated that these feelings of shame and discrimination "have long-term influences on mental health, physical

16

health, and overall wellbeing." (Fortenberry Decl. ¶¶ 34–35, ECF No. 22-2.)  He further opined that studies show that the "stress and victimization" experienced by transgender and gender nonbinary middle and high school students is associated "with a greater risk for posttraumatic stress disorder, depression, life dissatisfaction, anxiety, and suicidality as an adult" and that Plaintiffs' health and well-being would best be served by access to the boys' bathroom and locker facilities.  (*Id.* ¶¶ 34, 37.) And Dr. Fogel stated that being forced to use restrooms that differ from a person's identity can exacerbate the negative consequences of gender dysphoria and "can have permanent negative consequences." (Fogel Decl. ¶¶ 27–28, ECF No. 22-1.)  Plaintiffs detailed the distress and anxiety they experience and described how their exclusion from the boys' facilities worsens their anxiety and depression.  (B.E. Decl. ¶¶ 18, 22–23, 27, 29, 31, 39, ECF No. 22-4; S.E. Decl. ¶¶ 18, 22–23, 27, 29, 31, 39, ECF No. 22-5; L.E. Dep. 38, ECF No. 29-1.)  In short, there is a preventable risk that Plaintiffs will experience long-term detrimental effects on their health, and there is no adequate remedy for such a risk.  *See Whitaker*, 858 F.3d at 1046; s*ee also J.A.W. v. Evansville Vanderburgh Sch. Corp.*, 323 F. Supp. 3d 1030, 1042 (S.D. Ind. 2018) (finding "a monetary award would be an inadequate remedy for the type of stress and anxiety" transgender plaintiff would experience if injunction allowing for restroom access were not granted).

### 3.  Balancing of Harms and Public Interest

The Court has already described the irreparable harm Plaintiffs would suffer absent preliminary injunctive relief.  Now, the Court must balance that harm against

the harm Defendants would suffer if an injunction were granted, and the Court must consider the public interest. *Camelot Banquet Rooms, Inc.*, 24 F.4th at 644.

In support of their argument that the balance of harms weighs against a preliminary injunction, Defendants claim an injunction would violate the privacy interests of Plaintiffs' classmates and would "create many uncertainties," as the School would have to "immediately police students with different anatomy disrobing and showering in the same facility." (Defs.' Resp. 21, ECF No. 30.)  This argument does not tip the balance in this case for several reasons.  First, like the plaintiff in *Whitaker*, Plaintiffs used the boys' restroom at the beginning of the school year without incident; "[n]one of [Plaintiffs'] classmates questioned [their] presence in the boys' bathrooms." (B.E. Decl. ¶¶ 10–11, ECF No. 22-4; S.E. Decl. ¶¶ 10–11, ECF No. 22-5; Mason Dep. 29–30, ECF No. 43-1); *Whitaker*, 858 F.3d at 1055 (dismissing school district's argument that it would be harmed when plaintiff used the bathroom for months without incident and district failed to produce any evidence that any students ever complained about plaintiff's presence or that plaintiff's presence actually caused an invasion of any other student's privacy).  There is no reason to think the locker room would be any different: Plaintiffs will use the stalls to change for gym class, just as they used the stalls in the restroom.  (Pls.' Reply 4, ECF No. 44; B.E. Suppl. Decl. ¶ 6, ECF No. 43-7; S.E. Suppl. Decl. ¶ 6, ECF No. 43-8.)  Nor would showering be an issue: students generally do not use the locker room showers during the day, and Plaintiffs have stated that they would not use the showers in the boys' locker room.  (B.E. Suppl. Decl. ¶¶ 6–7, ECF No. 43-7; S.E. Suppl. Decl. ¶¶ 6–7, ECF

No. 43-8.)   Regarding Defendants' concerns about policing students with different anatomy disrobing in the same facility, to the extent Defendants mean they are concerned about distinguishing between transgender students and those students with merely a desire to gain access to the other locker room, (*see* Amicus Br. of Indiana & 13 Other States in Opp'n 11, ECF No. 35), then Plaintiffs are right: the School can require documentation to verify the legitimacy of a student's request, much like it already does.   (*See* Vigo County School Corporation Administrative Guideline Regarding Accommodations for Transgender Students, ECF No. 43-2.)

Finally, Defendants argue that public policy weighs against an injunction.   The decision that Title IX does not permit the separation of toilet, locker room, and shower facilities "on the basis of sex" should be made by Congress or through the notice-and-comment process, Defendants say.   (Defs.' Resp. 21–22, ECF No. 30.)   But that decision was already made when the Seventh Circuit decided *Whitaker*.   *See, e.g.*, *J.A.W. v. Evansville Vanderburgh Sch. Corp.*, 323 F. Supp. 3d 1030, 1042 (S.D. Ind. 2018) (granting transgender boy's motion for preliminary injunction to allow him to use boys' restroom; "the issuance of an injunction in this case would not require moving the applicable line from where the court in *Whitaker* has already drawn it"); *see Donohoe v. Consol. Operating & Prod. Corp.*, 30 F.3d 907, 910 (7th Cir. 1994) (in a hierarchical judiciary, lower courts should follow higher courts' decisions on point). And protecting civil rights is "a purpose that is always in the public interest." *Dodds v. U.S. Dept. of Educ.*, 845 F.3d 217, 222 (6th Cir. 2016) (citations omitted) (denying

motion to stay preliminary injunction that ordered school district to allow transgender girl to use girls' restroom).

Having determined that Plaintiffs will suffer irreparable harm absent preliminary injunctive relief, and that Defendants and the public interest will not be harmed if such relief is granted, this balance weighs in Plaintiffs' favor. *Whitaker*, 858 F.3d at 1054–55.

### C. Bond Requirement

Finally, Plaintiffs request that the injunction be issued without bond. (Mot. Prelim. Inj. 2, ECF No. 12; Pls.' Br. 32, ECF No. 22.) Rule 65 of the Federal Rules of Civil Procedure provides that a court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). However, Plaintiffs state that bond should not be required in this case because issuance of the injunction will not result in any monetary harm to the School. *See Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010) (district court can waive bond requirement when there is no danger the opposing party will incur any damages from the injunction). The School does not respond to this argument or contend that it would incur damages as a result of the injunction. Failure to respond to an argument results in waiver. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010). Accordingly, the Court will waive the bond requirement.

### Conclusion

Plaintiffs' Motion for Preliminary Injunction, (ECF No. 12), is **granted**. The injunction shall issue in a separate order. *See, e.g.*, *MillerCoors LLC v. Anheuser-Busch Cos., LLC*, 940 F.3d 922, 922–23 (7th Cir. 2019) (per curiam) (remanding for failure, in part, to enter injunction as a separate document).

**SO ORDERED**.

Date: 06/24/2022

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution to registered parties of record via CM/ECF.